**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| UTILITIES MARKETING GROUP, LLC, and AGR FIELD SERVICES, LLC, Plaintiffs,<br><br>vs.<br><br>JAMES WARRICK, ANGELA WARRICK, GEORGE TAPIA, AMANDA TAPIA, EXCEL NETWORK, LLC, EXCEL RESOURCES, LLC, NWELITE MARKETING, LLC, and UNKNOWN JOHN DOES,<br><br>Defendants. | Case No. |

## COMPLAINT

Utilities Marketing Group, LLC ("UMG"), and AGR Field Services, LLC ("AGRFS") (collectively "Plaintiffs"), by and through their counsel, respectfully file their Complaint against James Warrick ("J. Warrick"), Angela Warrick ("A. Warrick"), George Tapia ("G. Tapia"), Amanda Tapia ("A. Tapia") Excel Network, LLC, Excel Resources, LLC (collectively with Excel Network, "Excel"), NWElite Marketing, LLC ("NWElite"), and unknown John Does for: (1) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"), (2) breach of contract (three counts), (3) breach of fiduciary duty and the duty of loyalty, (4) aiding and abetting a breach of fiduciary duty, (5) tortious interference, (6) violation of the Florida Unfair and Deceptive Business Practices Act, (7) civil conspiracy and (8) violation of the Florida Uniform Trade Secrets Act.  In support of their Complaint, Plaintiffs state as follows:

## INTRODUCTION

1.      UMG and AGRFS are affiliated with AGR Group, LLC ("AGR"), which is the largest direct marketer dedicated to the retail energy business.

2.     Through its various business units, AGR offers full outsourcing of all energy related customer needs, including outbound telemarketing, consulting services, customer service, customer retention, lead generation and appointment setting, field services and canvassing, and third party verification.

3.     J. Warrick is a former employee of UMG who is now, in violation of his contractual and common law duties to UMG, attempting to compete with AGR and UMG by utilizing UMG's trade secrets, soliciting UMG's employees and customers, and partnering with subcontractors of AGRFS, including G. Tapia and A. Tapia.

4.     On September 9, 2014 — while J. Warrick was still employed by UMG — Warrick partnered with G. Tapia and A. Tapia to form Excel (the corporate filings were made in the names A. Tapia and A. Warrick).

5.     Excel offers nearly identical services to AGR and its affiliates.

6.     Since its inception, Excel has attempted to directly compete with AGR, UMG, and AGRFS through unfair trade practices, including exploiting trade secrets, proprietary material, and otherwise confidential information provided by J. Warrick, G. Tapia, and A. Tapia, and soliciting employees and clients of Plaintiffs in contravention of contractual obligations and common law duties.

7.     Plaintiffs now bring this action to hold Defendants responsible for their contractual breaches and common law violations and put an end to their unlawful trade practices.

## JURISDICTION AND VENUE

8.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S. Code § 1331, because the CFAA count presents a federal question.

9.     The Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S. Code § 1367, because they arise out of the same case or controversy.

10.     UMG is a Florida limited liability company.  Its members are FMR Management, Inc., a Nevada corporation with its principal place of business in Nevada; HNH, Inc., a Florida corporation with its principal place of business in Florida; and QLIV, Inc., a Nevada corporation with its principal place of business in Nevada.

11.     AGRFS is a Florida limited liability company.  Its sole member is Gold Glimpses, Inc., a Florida corporation with its principal place of business in Florida.

12.     J. Warrick is an individual who is a citizen of Florida.  J. Warrick's principal place of residence is 1801 Bayou Grande Boulevard NE, St. Petersburg, Florida 33703.

13.     A. Warrick is an individual who is a citizen of Florida.  A. Warrick's principal place of residence is 1801 Bayou Grande Boulevard NE, St. Petersburg, Florida 33703.

14.     G. Tapia is an individual who is a citizen of Florida.  G. Tapia's principal place of residence is 2012 Tamarind Street, Port Charlotte, Florida 33948.

15.     A. Tapia is an individual who is a citizen of Florida.  A. Tapia's principal place of residence is 2012 Tamarind Street, Port Charlotte, Florida 33948.

16.     Excel Network, LLC is a Florida limited liability company.  Its members are A. Warrick, and A. Tapia, who are citizens of Florida.

17.     Excel Resources, LLC is a Florida limited liability company.  Its sole member is A. Tapia, who is a citizen of Florida.

18.     NWElite is a Maryland limited liability company.  Its membership is currently unknown to Plaintiffs.

19.     The unknown John Doe defendants are other individuals or corporations who have participated in Defendants' unlawful scheme.

20.     This Court has personal jurisdiction over the Defendants, because, as detailed above and in the following paragraphs, each of them is a citizen of Florida; is a resident of this District; operates, conducts, engages in or carries on a business or business venture in this

3

District; has an office or agency in this District; committed a tortious act within this District; breached a contract in this District by failing to perform acts required by the contract to be formed in this District; and/or is engaged in substantial and not isolated activity in this District.

21.     Venue is proper in this Court pursuant to 28 U.S. Code § 1391, because upon information and belief one or more of the Defendants resides in this District, and a substantial part of the events giving rise to the claims occurred in this District.  Moreover, the applicable contract between J. Warrick and UMG contains a forum selection clause designating this Court as a proper venue.  *See* Exhibit A at ¶ IX.E.

## FACTUAL BACKGROUND

### J. Warrick's employment and contractual relationships with UMG

22.     J. Warrick was employed by UMG for more than a decade, beginning in the early 2000s.  J. Warrick began as the director of sales and was promoted to vice president for external operations in 2012.

23.     In both of those roles, J. Warrick had access to trade secrets, proprietary material, and other confidential information belonging to UMG, AGRFS, and AGR, including customer lists and information, personnel files, and pricing.

24.     On August 21, 2009, J. Warrick signed a Confidentiality, Nonsolicitation, and Reimbursement Agreement.  A true and correct copy of that agreement, as signed by J. Warrick, is attached hereto as **Exhibit A**.

25.     The agreement states, in relevant part:

Employee also agrees that the use and disclosure of Confidential Information/Trade Secrets must be carefully and continuously controlled for the benefit of the Company and its authorized designees, and Employee will comply with all Company rules and procedures to do so.

Exh. A at ¶ I.B.

26.     The agreement further states:

4

Employee agrees that any disclosure or use of Confidential Information/Trade Secrets by Employee, other than in connection with Company's business or as authorized by Company, would be highly detrimental to the business interests of Company and/or that of its customers or vendors.  Employee acknowledges that serious and substantial loss of business and pecuniary damages to Company and/or its customers or vendors would result therefrom.

Exh. A at ¶ I.D.

27.     The agreement further states:

Employee agrees that, except as may be required by Employee's employment with Company, Employee shall not, without Company's prior written consent (which may be denied at Company's sole discretion for any or no reason), disclose, remove from UMG premises, or use at any time, either during his/her employment with Company or after the cessation of such employment, any Confidential Information/Trade Secrets, regardless of whether Employee developed or originated such information.  Employee further agrees not to render any services for or on behalf of any person or entity which has improperly acquired or misappropriated any such Confidential Information/Trade Secrets.

Exh. A at ¶ I.E.

28.     The agreement further states:

Employee agrees that, upon cessation of his/her employment with Company or at any other time Company requests, Employee will promptly deliver all Confidential Information/Trade Secrets, together will other Company documents or property in his/her possession, custody, or control to Company in Pinellas County, Florida.

Exh. A at ¶ I.F.

29.     The agreement further states:

Upon cessation of Employee's employment with Company, Employee shall meet with Steve Upham, the Personnel Manager (or an authorized designee) on or before Employee's last day of work to review Employee's obligations under this Agreement.  Employee's failure to comply with this paragraph shall constitute a material breach of this Agreement.

Exh. A at ¶ I.H.

30.     The agreement further states:

Employee agrees that during the course of his/her employment with Company, Employee shall not render any services to, including as manager or sales or service representative, nor have any financial or other interest in any competitor, vendor, or customer of Company, nor engage in any additional outside business

5

activities that may be a conflict of interest without Company's prior written consent, which may be denied at Company's sole discretion for any reason.

Exh. A at ¶ III.A.

31.     The agreement further states:

Employee agrees that, except on Company's behalf, during the course of his/her employment with Company ***and for a period of two (2) continuous years after the cessation of such employment***, Employee shall not, directly or indirectly, on his/her behalf or on behalf of any other person or entity, solicit or attempt to procure the trade, business, or patronage of any Company vendors, customers, or prospective customers with whom the Employee had any contact while in the employment of the Company, in all counties in which the Company is engaged in substantial business.

Exh. A at ¶ IV.A (emphasis added).

32.     The agreement further states:

Employee agrees that, during his/her employment with Company ***and for a period of two (2) continuous years following its cessation***, Employee shall refrain from any activity that directly or indirectly causes or seeks to cause any other individual to leave his/her employment with Company or which recruits, hires, or attempts to recruit or hire any other individual employed by Company or its related or affiliated companies.

Exh. A at ¶ V.A (emphasis added).

33.     The agreement further states:

Employee agrees that it would be difficult to measure money damages in the event of a threatened or actual breach hereof.  Should Company seek equitable relief to enforce any provision of this Agreement, Employee shall not assert the claim or defense that an adequate remedy exists at law.

Exh. A at ¶ IX.D.

34.     The agreement further states

Employee agrees that, because Company is engaged in a highly competitive business and because Employee will have access to Company's Confidential Information/Trade Secrets, Employee would cause Company great and irreparable harm by engaging directly or indirectly in any of the prohibited activities or otherwise failing to adhere to his/her obligations. . . .

Exh. A at ¶ IX.G.

**The Tapias' contractual relationship with AGRFS**

35.     G. Tapia is the national sales director for NWElite.

36.     Upon information and belief, A. Tapia also is an officer or manager for NWElite.

37.     G. Tapia signed a Subcontractor Agreement on behalf of NWElite with AGRFS on  August 14, 2013.  A true and correct copy of that agreement is attached hereto as **Exhibit B**.

38.     Under the agreement, the subcontractor — which expressly includes its owners, officers, employees, agents, and principals — agrees to refrain from any "Prohibited Activity," which is defined to include:

> [A]ctivity in which Subcontractor, including its owners, officers, employees, agents and principals, contributes its knowledge, directly or indirectly, in whole or in part, as an employee, employer, owner, operator, manager, advisor, consultant, agent, independent contractor, partner, director, stockholder, officer, volunteer, intern or any other similar capacity to [DPL Energy Resources, Inc. ("DPLER")]. Prohibited Activity also includes activity that may require or inevitably require disclosure of trade secrets, proprietary information or Confidential Information.

Exh. B at Section 15(b).

39.     The agreement further states:

> Subcontractor, including its owners, officers, employees, agents and principals, further agrees not to "poach" or entice any of Prime Contractor's sales agents, employees, or DPLER for any reason with an offer, agreement and/or contract of any kind for a period of three (3) years following termination or expiration of this Agreement.  Subcontractor, including its owners, officers, employees, agents and principals, further agrees not to contact or speak to any of Prime Contractor's employees, agents, DPLER (or their respective agents, employees or representatives) including, but not limited to, any and all clients and/or customers that Subcontractor has recruited on behalf of Prime Contractor or DPLER in connection with your engagement by Prime Contractor or otherwise, for a period of two (2) years following termination or expiration of this Agreement.

Exh. B at Section 15(c).

40.     The agreement further states:

> Subcontractor, including its owners, officers, employees, agents and principals, agrees and covenants, during the term of the Subcontractor Agreement and for the two (2) year period thereafter, agrees not to directly or indirectly solicit, contact (including but not limited to e-mail, regular mail, express mail, telephone, fax, and instant message), attempt to contact or meet with Prime Contractor's DPLER customers for purposes of offering or accepting goods or services similar to or competitive with those offered by Prime Contractor.

Exh. B at Section 15(d).

41.     The agreement further states:

Subcontractor, including its owners, officers, employees, agents and principals, agrees that it shall not compete with Prime Contractor and/or provide any services to DPLER for two (2) years following the termination of Subcontractor's engagement by Prime Contractor. . . . Subcontractor, including its owners, officers, employees, agents and principals, is prohibited from utilizing any information that it has learned from its dealings with Prime Contractor to communicate with, poach, and/or obtain any business with DPLER and/or customers or for any other use.

Exh. B at Section 15(e).

42.     The agreement further states:

Subcontractor, including its owners, officers, employees, agents and principals, further understands and acknowledges that this Confidential Information and Prime Contractor's ability to reserve it for the exclusive knowledge and use of Prime Contractor is of great competitive importance and commercial value to Prime Contractor, and that improper use or disclosure of the Confidential Information by Subcontractor, including its owners, officers, employees, agents, and principals, might cause Prime Contractor to incur financial costs, loss of business advantage, liability under confidentiality agreements with third parties, civil damages, and criminal penalties.

Exh. B at Section 16(a).

43.     This contract is still in effect and NWElite was paid $164,946.20 under this agreement in 2013 and 2014.

**Formation of Excel and end of J. Warrick's employment with UMG**

44.     In his final months as a UMG employee, J. Warrick exceeded his authorized access to trade secrets, proprietary material, and other confidential information on UMG's computer systems by emailing those materials to a personal email account.

45.     Shortly before his departure, J. Warrick conspired with another UMG employee in an attempt to modify his contractual obligations via an amendment backdated to May 2014. Any such amendment is void, because it was induced by fraud and in violation of J. Warrick's fiduciary duties to UMG.

46.     On September 9, 2014, while J. Warrick was still employed by UMG and while NWElite was still bound by a non-compete agreement with AGRFS, Excel Network, LLC was formed under the names of A. Warrick and A. Tapia.

47.     On or around that same date, J. Warrick announced he would be resigning from UMG effective September 19, 2014.

48.     J. Warrick's last day as an employee of UMG was September 19, 2014.

49.     Excel Resources, LLC was formed a month later, on October 22, 2014.

**Improper competitive behavior by the Warricks and the Tapias through Excel**

50.     J. Warrick is now the vice president of business development for Excel Network, which places him in direct competition with UMG.

51.     As early as September 25, 2014, J. Warrick was attempting to contact subcontractors for AGRFS, in violation of his agreements with UMG.

52.     J. Warrick, both individually and through Excel, has solicited AGRFS employees and customers in violation of his agreements with UMG.

53.     In doing so, J. Warrick has relied on his unique knowledge of UMG's and AGRFS' trade secrets, proprietary material, and other confidential information, including customer lists, customer files and information, personnel files, pricing lists, computer records, and financial and marketing data.

54.     A. Warrick, in connection with her role with Excel, has aided J. Warrick in these activities, with full knowledge that J. Warrick was relying on UMG's trade secrets, proprietary material, and other confidential information.

55.     NWElite, the Tapias, and/or a related entity have solicited AGRFS employees and customers on behalf of J. Warrick and/or Excel, in violation of NWElite's agreement with AGR.

56.     The Warricks are also connected to a company called DM Marketing, which has been involved in call center services related to the energy industry.

57.     Defendants attempted to hire away one senior executive for UMG by offering him a 40 percent stake in Excel and a $100,000 signing bonus.

58.     Defendants continue to actively recruit current and former employees of the AGR entities, and Excel employs at least six former employees of UMG and two former employees of an AGRFS broker.

59.     Defendants also employ or have employed several former members of UMG's information technology departments.

### Count I – Violation of Computer Fraud and Abuse Act
### (UMG Against All Defendants)

60.     UMG incorporates Paragraphs 1 through 59 by reference as if fully set forth herein.

61.     The CFAA provides a private cause of action against anyone that "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer." 18 U.S.C. §§ 1030(a)(2)(c), 1030(g).

62.     The CFAA defines a "protected computer" as a computer "which is used in or affecting interstate or foreign commerce or communication." 18 U.S.C § 1030(e)(2)(b).

63.     The CFAA allows for a private cause of action if there is a "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i).

64.     UMG's computers are used in and affect interstate commerce by operating marketing campaigns directed to consumers in multiple states.

65.     In accessing trade secrets, proprietary material, and other confidential information for the benefit of Excel while still employed at UMG and emailing those materials from his UMG-issued email account to a separate personal account, J. Warrick exceeded his authorized access.

66.     J. Warrick's conduct was instigated by the other Defendants, who conspired with J. Warrick to carry out this unlawful access to UMG's trade secrets, proprietary material, and other confidential information.

67.     The Defendants were not merely passive recipients of the information improperly obtained by J. Warrick, but rather induced him to access the protected computers beyond his authorized level of access.

68.     Defendants' conduct in improperly accessing and sharing UMG's trade secrets, proprietary material, and other confidential information caused harm to UMG in excess of $5,000 during the one-year period leading up to the filing of this lawsuit.

WHEREFORE, UMG prays for preliminary and permanent injunctive relief  barring Defendants from continuing to use UMG's trade secrets, proprietary material, and other confidential information, compensatory damages, costs, and prejudgment interest against Defendants for their unauthorized access to UMG's computer systems, and for such other relief as the Court deems just and proper.

### Count II – Breach of Contract
### (UMG Against J. Warrick – Confidentiality, Nonsolicitation, and Reimbursement Agreement)

69.     UMG incorporates Paragraphs 1 through 59 by reference as if fully set forth herein.

70.     The Confidentiality, Nonsolicitation, and Reimbursement Agreement signed by J. Warrick on August 21, 2009, is a binding contractual agreement.  *See* Exh. A.

71.     Pursuant to the terms of the agreement, J. Warrick agreed not to "disclose, remove from UMG premises, or use at any time, either during his/her employment with Company *or after the cessation of such employment*, any Confidential Information/Trade Secrets."  Exh. A at ¶ I.E (emphasis added).

72.     J. Warrick used UMG's confidential information and trade secrets on behalf of Excel both before **and after** the cessation of his employment with UMG.

73.     Pursuant to the terms of the agreement, J. Warrick agreed to "promptly deliver all Confidential Information/Trade Secrets, together with other Company documents or property" in his possession to UMG at the time of his termination.  Exh. A at ¶ I.F.

74.     This did not occur.

75.     Pursuant to the terms of the agreement, J. Warrick agreed to meet with UMG's personnel manager or authorized designee upon his termination.  *See* Exh. A at ¶ I.H.

76.     This did not occur.

77.     The agreement specifically states that failure to comply with this provision shall constitute a material breach.  *See* Exh. A at ¶ I.H.

78.     Pursuant to the terms of the agreement, J. Warrick agreed not to "render any services to, including as manager or sales or service representative, nor have any financial or other interest in any competitor, vendor, or customer of Company, nor engage in any additional outside business activities that may be a conflict of interest."  Exh. A at ¶ III.A.

79.     J. Warrick breached this contractual provision by founding Excel and serving as its vice president of business development while he was still an employee of UMG.

80.     Pursuant to the agreement, J. Warrick agreed that he would not, for a period of two years after the cessation of his employment with UMG (through September 19, 2016), "directly or indirectly, on his/her behalf or on behalf of any other person or entity, solicit or attempt to procure the trade, business or patronage of any Company vendors, customers, or prospective customers with whom the Employee had any contact while in the employment of the Company, in all counties in which the Company is engaged in substantial business." Exh. A at ¶ IV.A.

81.     J. Warrick has breached this provision by soliciting UMG's customers.

82.     Pursuant to the agreement, J. Warrick agreed that he would not, for a period of two years after the cessation of his employment with UMG (through September 19, 2016), engage in any activity that "directly or indirectly causes or seeks to cause any other individual to leave his/her employment with Company or which recruits, hires, or attempts to recruit or hire any other individual employed by Company or its related or affiliated companies."  Exh. A at ¶ V.A.

83.     J. Warrick has violated this provision by recruiting and/or hiring employees from UMG and AGRFS to Excel.

84.     As a result of J. Warrick's breaches, UMG has suffered damages in an amount to be proven at trial.

WHEREFORE, UMG prays for preliminary and permanent injunctive relief barring Warrick from continuing to use UMG's trade secrets, proprietary material, and other confidential information and barring J. Warrick from soliciting UMG's customers and employees for a period of two years, compensatory damages, attorneys' fees, costs, and prejudgment interest against J. Warrick for his breach of the Confidentiality, Nonsolicitation, and Reimbursement Agreement, and for such other relief as the Court deems just and proper.

### Count III – Breach of Contract
### (AGRFS Against NWElite, G. Tapia, and A. Tapia – Subcontractor Agreement)

85.     AGRFS incorporates Paragraphs 1 through 59 by reference as if fully set forth herein.

86.     The Subcontractor Agreement defines "Subcontractor" to include both NWElite as a company and the Tapias as officers and principals.

87.     Pursuant to the Subcontractor Agreement, NWElite and the Tapias are barred from participating in any activity that may require disclosure of trade secrets, proprietary material, or confidential information.  Exh. B at Section 15(b).

88.     The Tapias breached this contractual provision by disclosing trade secrets, proprietary material, and confidential information to Excel, and NWElite is liable for the Tapias' breach.

89.     Pursuant to the Subcontractor Agreement, NWElite and the Tapias are barred from "poaching" any AGRFS agents or employees for a period of three years following termination of the Subcontractor Agreement (which has not yet occurred).  Exh. B at Section 15(c).

90.     The Tapias breached this contractual provision by recruiting and/or hiring employees of AGR, UMG, and/or AGRFS for Excel, including, but not limited to, J. Warrick and the UMG executive that was offered a 40% stake in Excel at a $100,000 signing bonus, and NWElite is liable for the Tapias' breach.

91.     Pursuant to the Subcontractor Agreement, NWElite and the Tapias are barred from soliciting and/or contacting AGRFS's customers for a period of two years after the termination of the Subcontractor Agreement (which has not yet occurred).  Exh. B at Section 15(d).

92.     The Tapias breached this contractual provision by soliciting and/or contacting AGRFS's customers for Excel, and NWElite is liable for the Tapias' breach.

93.     Pursuant to the Subcontractor Agreement, NWElite and the Tapias are barred from competing with AGRFS for a period of two years after the termination of the Subcontractor Agreement (which has not yet occurred).  Exh. B at Section 15(e).

94.     The Tapias breached this contractual provision by competing with AGRFS on behalf of Excel, and NWElite is liable for the Tapias' breach.

95.     As a result of these breaches, AGRFS has suffered damages in an amount to be proven at trial.

WHEREFORE, AGRFS prays for preliminary and permanent injunctive relief barring G. Tapia, A. Tapia, and NWElite from continuing to use AGRFS's trade secrets, proprietary material, and other confidential information and barring G. Tapia, A. Tapia, and NWElite from soliciting AGRFS's customers and employees for a period of two years, compensatory damages, costs, and prejudgment interest against G. Tapia, A. Tapia, and NWElite for breach of the Subcontractor Agreement, and for such other relief as the Court deems just and proper.

### Count IV – Breach of Fiduciary Duty and Duty of Loyalty
### (UMG Against J. Warrick)

96.     UMG incorporates Paragraphs 1 through 59 by reference as if fully set forth herein.

97.     During his employment with UMG, J. Warrick had a common law fiduciary duty and duty of loyalty arising from his position of confidence in UMG, and he was entrusted with trade secrets, proprietary material, and other confidential information belonging to UMG.

98.     J. Warrick's position and the circumstances of his employment created a situation entitling UMG to his undivided loyalty and fidelity during his employment at UMG, and J. Warrick had a duty to act loyally to UMG in all matters during the course of his employment, including acting in the best interest and for the benefit of UMG at all times, and not transferring his loyalty to a competitor.

99.     Even after announcing his resignation, J. Warrick had a duty not to use to his own advantage (and that of a competitor) trade secrets belonging to UMG.

100.    While still employed by UMG and without informing or notifying UMG, J. Warrick conspired with others (including A. Warrick and the Tapias) to form a competing company (Excel), terminate his employment with UMG, and immediately commence employment with Excel, attempting to convert as many of UMG's client relationships as possible.

101.    J. Warrick has breached his fiduciary duty and duty of loyalty by violating his contractual and common law obligations by forming Excel while still employed by UMG.

102.    J. Warrick also has breached his fiduciary duty and duty of loyalty by encouraging, facilitating, and soliciting other employees of UMG to seek employment with Excel and other competitors of AGR.

103.    As a result of the foregoing breaches, UMG has sustained damages in an amount to be proven at trial.

WHEREFORE, UMG prays for compensatory damages, punitive damages, the equitable remedy of disgorgement of Warrick's bonuses, commissions, and compensations at Excel, costs, and prejudgment interest against Warrick for his breach of his fiduciary duty and duty of loyalty, and for such other relief as the Court deems just and proper.

### Count V – Aiding and Abetting Breach of Fiduciary Duty
### (UMG Against Excel)

104.    UMG incorporates Paragraphs 1 through 59 by reference as if fully set forth herein.

105.    At all relevant times, Excel knew or should have known that J. Warrick owed contractual and common law duties of loyalty to UMG including, without limitation, the duty to act in the best interests of UMG while employed by UMG, the duty not to conspire to injure UMG, the duty not to encourage or assist in the facilitation of employees terminating their employment with UMG, the duty not to disregard his contractual obligations to UMG, and the duty not to disclose or utilize trade secrets, proprietary material, and other confidential information for his own benefit or to benefit Excel.

106.    Excel nonetheless encouraged, approved of, and actively participated in the direction and coordination of J. Warrick's wrongful conduct.

107.    Excel knowingly approved of and accepted the disclosure of UMG's trade secrets for the purpose of converting UMG's client and business relationships for the benefit of Excel.

108.    By acting as set forth above, Excel actively aided and abetted J. Warrick in breaching his fiduciary duty and duty of loyalty to UMG.

109.    As a result of the foregoing, UMG has sustained damages in an amount to be proven at trial.

WHEREFORE, UMG prays for compensatory damages, punitive damages, the equitable remedy of disgorgement of Excel's profits as a result of the breach, costs, and prejudgment interest against Excel aiding and abetting J. Warrick's breach of his fiduciary duty and duty of loyalty, and for such other relief as the Court deems just and proper.

### Count VI – Tortious Interference
### (Against All Defendants)

110.    Plaintiffs incorporate Paragraphs 1 through 59 by reference as if fully set forth herein.

111.    At all relevant times, Plaintiffs maintained advantageous and valuable business relationships with individuals and entities that Plaintiffs developed as clients over the course of many years and at significant effort and expense.

112.    Additionally, at all relevant times, Plaintiffs maintained advantageous business and contractual relationships with employees and contractors who have since been solicited and/or hired away by Excel.

113.    At all relevant times, Defendants knew or should have known with the exercise of reasonable diligence of the existence and nature of these business and contractual relationships between Plaintiffs and their clients and between Plaintiffs and their employees and contractors.

114.    Defendants intentionally and unjustifiably interfered with these contractual and business relationships by disclosing and utilizing Plaintiffs' trade secrets, proprietary material, and other confidential information.

115.    Defendants intentionally and unjustifiably interfered with these contractual and business relationships by encouraging, incentivizing, directing, promoting, approving, and/or allowing J. Warrick and the Tapias to violate their contractual and business relationships with Plaintiffs.

116.    Defendants intentionally and unjustifiably interfered with these contractual and business relationships by encouraging, incentivizing, directing, promoting, approving, and/or allowing employees to leave Plaintiffs and join Defendants.

117.    As a result of the foregoing, Plaintiffs have suffered damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs pray for preliminary and permanent injunctive relief barring Defendants from tortuously interfering with Plaintiffs' business, compensatory damages, punitive damages, the equitable remedy of disgorgement, costs, and prejudgment interest against Defendants for their tortious interference, and for such other relief as the Court deems just and proper.

### Count VII – Florida Unfair and Deceptive Business Practices Act
### (Against Excel)

118.    Plaintiffs incorporate Paragraphs 1 through 59 by reference as if fully set forth herein.

119.    Excel utilized unfair methods of competition, unconscionable acts or practices and unfair or deceptive practices in the conduct of trade or commerce within the meaning of Fla. Stat. § 501.204.

120.   Excel accepted from J. Warrick, G. Tapia, and A. Tapia trade secrets, proprietary material, and other confidential information belonging to Plaintiffs and utilized and continue to utilize this information for Excel's own benefit and to the detriment of Plaintiffs.

121.   As a result of the foregoing, Plaintiffs have suffered damages in an amount to be proven at trial.

122.   Pursuant to Fla. Stat. § 501.205, Plaintiffs are entitled to recover their attorneys' fees from Excel.

WHEREFORE, Plaintiffs pray for compensatory damages, attorneys' fees, costs, and prejudgment interest against Excel for its unfair trade practices, and for such other relief as the Court deems just and proper.

### Count VIII – Civil Conspiracy
### (Against All Defendants)

123.   Plaintiffs incorporate Paragraphs 1 through 59 by reference as if fully set forth herein.

124.   Defendants conspired together to do an unlawful act.  Namely, the subject of the conspiracy was to tortiously interfere with Plaintiffs' business relations, convert Plaintiffs' trade secrets, proprietary material, and other confidential information, and convert Plaintiffs' clients.

125.   Defendants executed overt acts in furtherance of the conspiracy by forming Excel while J. Warrick was still employed by UMG and working together to compete with Plaintiffs while J. Warrick, NWElite, and the Tapias all had contractual duties to Plaintiffs.

126.   As a result of the foregoing, Plaintiffs have suffered damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs pray for preliminary and permanent injunctive relief, compensatory damages, punitive damages, costs, and prejudgment interest against Defendants for their civil conspiracy, and for such other relief as the Court deems just and proper.

## Count IX – Uniform Trade Secrets Act
### (Against All Defendants)

127.    Plaintiffs incorporate Paragraphs 1 through 59 by reference as if fully set forth herein.

128.    J. Warrick and the Tapias disclosed to Excel trade secrets belonging to Plaintiffs that they learned by virtue of their relationships with Plaintiffs.

129.    At the time of those disclosures, J. Warrick and the Tapias knew they were bound by contractual agreements to maintain the secrecy of the information and/or limit its use.

130.    At the time of those disclosures, J. Warrick and the Tapias knew that the information would be used by Excel for the purpose of attempting to compete with Plaintiffs.

131.    Acting both individually and in concert, Defendants used this information without the express or implied consent of Plaintiffs.

132.    The information that J. Warrick and the Tapias disclosed to Excel constitute trade secrets because it is information that derives independent economic value from not being generally known, or not being readily ascertainable by proper means, by other persons who can obtain economic value from its disclosure or use.

133.    Plaintiffs made reasonable efforts to maintain the secrecy of their trade secrets, including implementation of the contracts binding J. Warrick, NWElite, and the Tapias.

134.    As a direct and proximate cause of Defendants' misappropriation of Plaintiffs' trade secrets, Plaintiffs have been damaged, Defendants have been unjustly enriched, and Plaintiffs are entitled to a reasonable royalty for the misappropriation.

135.    Pursuant to Fla. Stat. § 688.005, Plaintiffs are entitled to recovery their attorneys' fees from Defendants.

WHEREFORE, Plaintiffs pray for preliminary and permanent injunctive relief, compensatory damages comprising actual damages and unjust enrichment of Defendants,

attorneys' fees, costs, and prejudgment interest against Defendants for their misappropriation of trade secrets, and for such other relief as the Court deems just and proper.

Dated:   August 24, 2015

By: /James B. Lake/
James B. Lake
Florida Bar No. 0023477
jlake@tlolawfirm.com
THOMAS & LOCICERO PL
601 S. Boulevard
Tampa, FL 33606
Tel: 813.984.3060
Fax: 813.984.3070

Blaine C. Kimrey
(*pro hac vice* application to follow)
bkimrey@vedderprice.com
Bryan K. Clark
(*pro hac vice* application to follow)
bclark@vedderprice.com
VEDDER PRICE P.C.
222 North LaSalle Street
Chicago, Illinois 60601
Tel: 312.609.7810
Fax: 312.609.5005